# UNITED STATES DISTRICT COURT WESTERN DISTRICT OF KENTUCKY LOUISVILLE DIVISION

*ELECTRONICALLY FILED*
3:24-cv-296-DJH

QUOC DINH                                                                    PLAINTIFF

v.                              **VERIFIED COMPLAINT**

JULIE CAMPBELL
(sued in her individual capacity)

SERVE: JULIE CAMPBELL
   EXECUTIVE DIRECTOR
   KENTUCKY BOARD OF COSMETOLOGY
   1049 U.S. HWY 127
   Frankfort, KY 40601

and                                                                         DEFENDANTS

CHRISTOPHER D. HUNT
(sued in his individual capacity)

SERVE: CHRISTOPHER D. HUNT
   OFFICE OF THE ATTORNEY GENERAL
   1024 Capital Center Drive, Suite 200
   Frankfort, KY 40601

and

JASON K. BACK
(sued in his individual capacity)

1

SERVE: JASON K. BACK
       172 GRIMES ROAD
       London, KY 40741


and

TANYA SHROUT
(sued in her individual capacity)

SERVE: TANYA SHROUT
       KENTUCKY BOARD OF COSMETOLOGY
       1049 U.S. HWY 127
       Frankfort, KY 40601

## I. INTRODUCTION

1.     Plaintiff Quoc Dinh, a Vietnamese American man, and a former licensed nail technician and salon owner from the Commonwealth of Kentucky, complains that the Defendants named above arbitrarily, capriciously, fraudulently and maliciously expanded, and applied state administrative law against him to the point of violating the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, his First Amendment right to free speech, as well as his due process rights protected by the Fourteenth Amendment to the United States Constitution.

2.     As more fully set forth below, on May 18, 2023, two government agents walked into Mr. Dinh's nail salon in St. Matthews, KY for an unannounced inspection. Within 22 minutes of their arrival, the Plaintiff's business of 17 years was permanently and irreparably closed without a reasonable basis.

3.     The Defendants acted without statutory authority in so closing the Plaintiffs salon.  Pursuant to KRS 317A.020 (7), the Kentucky Board of Cosmetology (the KBC) *may* – as a collective body – order salons to be closed in the rare event that immediate closure is necessary to protect the public from imminent harm.  However, in this case, there was no immediate threat of imminent harm, and the board did not order the closure.  Instead, Defendant Shrout, an executive assistant to Defendant Campbell, unilaterally ordered the salon to be closed, and then Defendants Campbell and Hunt fraudulently covered for her.

4.     After Defendant Shrout and Back illegally closed the Plaintiffs salon, Defendants Hunt and Campbell conspired with one another to fraudulently create and deliver documentation claiming that  emergency closure came from "the board" as a

whole, when  documentation retrieved from the Open Records Act show otherwise. Defendant Hunt created, and Defendant Campbell signed documentation claiming that the board – as a whole – met, reviewed evidence, and found the salon to be a threat to public safety, in order to give Defendant Shrout's illegal order an appearance of legitimacy.

5.      In addition to this excessive and fraudulent action, the Defendants then denied the Plaintiff a prompt post-suspension hearing, which violated the Equal Protection Clause of the United States Constitution, as well as his due process rights preserved therein.

6.      Pursuant to KRS 13B.125, any Kentucky agency who orders a business to be closed on an emergency basis must provide a due process hearing within 10 days after the accused request one.   In this case, the accused was not given a hearing until December 14, 2023, which was seven months after he first sought relief.

7.      The result has been a complete loss of the Plaintiffs livelihood and salon business, as well as severe and irreparable damage to his personal and professional reputation for which the Defendants are fully responsible.

## II. JURISDICTION AND VENUE

8.      The Plaintiff seeks damages from the Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1983 for arbitrary, capricious, fraudulent, and malicious violations of the rights, privileges, and immunities guaranteed him by the First, and Fourteenth Amendments to the Constitution of the United States.

9.      Accordingly, this Court has jurisdiction over this case pursuant to the provisions of 28 U.S.C. § 1331 and § 1343.

10. This Court has supplemental jurisdiction over any of the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

11. Jefferson County, Kentucky is the location of all acts pertinent to this suit, and venue is therefore proper in this Court.

### III. PARTIES

12. Plaintiff, Quoc Dinh (hereinafter "Plaintiff," or "Mr. Dinh"), is an individual who resides in Jefferson County, Ky.   Mr. Dinh held a dual license from the Kentucky Board of Cosmetology (KBC).  The first license was his own personal license as a nail technician, which is License # 505337.   The second license held by Mr. Dinh is License # 800000399, which is a salon license for Tippi Nail Lounge, which was a Kentucky nail salon, located at 3938 Shelbyville Road, Louisville, KY 40207.

13. Defendant Julie Campbell (hereinafter "Campbell") at all times relevant was the Executive Director of the KBC, and is sued in her individual capacity for violating Mr. Dinh's Constitutional rights under color of state law.  The KBC was at all times relevant to this complaint and petition an independent agency of Kentucky's state government entrusted with the "complete supervision over the administration of (provisions related to) cosmetology, cosmetologists, schools of cosmetology, or esthetic practices or nail technology, students, estheticians, nail technicians, instructors of cosmetology, instructors of esthetic practices, or instructors of nail technology, cosmetology salons, esthetic salons, and nail salons." KRS 317A.030 (1).

14. Defendant Tanya Shrout (hereinafter "Shrout") at all times relevant was the executive assistant to Defendant Campbell, and is sued in her individual capacity for Constitutional violations under color of state law.

15.     Defendant Christopher Hunt (hereinafter "Hunt") at all times relevant was the General Counsel of the KBC and is sued in his individual capacity for Constitutional violations under color of state law as well as defamation.

16.     Defendant Jason Back (hereinafter "Back") at all times relevant was a salon inspector for the KBC and is sued in his individual capacity for at least one Constitutional violation.

### IV. NATURE OF DEFENDANTS' CONDUCT

17.     On May 18, 2023, Back and Stidham walked into an Asian owned nail salon in St. Matthews, KY for an unannounced inspection.   Within minutes Back stepped outside and called Shrout to "relay his findings."   Back greatly and maliciously exaggerated his findings, and Shrout ordered the salon to be closed immediately.

18.     Back maliciously sought the closure of the salon in retaliation of Stidham getting bit by a dog inside the salon, and then the Plaintiff publicly challenging his authority.

19.      While the inspection took place, Stidham went into an employee only section of the salon, and reached near the salon owner's leg to inspect monomer.  By doing this, she cornered the salon owner's dog who bit her in self defense.  Back then threatened to shoot the dogs if they were not immediately put away.  He made this threat in public, in front of customers.  The Plaintiff told Back that threats of violence were not necessary, and Back took that as a challenge to his authority.  He then yelled at the Plaintiff, walked outside, and retaliated by calling Shrout and telling her that the Plaintiffs ran a dangerous salon.

20.     Shrout ordered then immediately ordered the salon to be closed.   She had no legislative authority to do that.   KRS 317A.020 (7) reserves emergency closure authority to the board as a whole, yet public records show that the board as a whole never met.

21.     That did not stop Hunt from creating documentation suggesting that the board met as a whole, when they did not.   Hunt created that documentation, and Campbell signed it, and together, they created the fraudulent perception of statutory compliance necessary to close the Plaintiff's salon.

22.     The fraudulent emergency order suspended the Plaintiffs personal and business license in a show of arbitrary and capricious force.   Hunt and Campbell did this in order to cut off the Plaintiff's ability to work and make money, which would serve to extort him into pleading guilty to administrative violations and crimes that he did not commit, and pay an excessive fine that he could not afford.

23.     The Plaintiff then made several attempts to reopen his salon, or release – at least – his personal license, but "the board" allegedly would not budge.

24.     The Plaintiff ultimately hired the undersigned counsel and filed an administrative appeal on July 13, 223.

25.     Pursuant to KRS 13B.125 (1) and (3) the KBC was required to provide the Plaintiff with an emergency hearing by July 23, 2023, but that never happened.

26.     Instead, the KBC refused to provide the Plaintiff with an emergency hearing, and instead demanded that he either pay the excessive fine, and admit to crimes and violations that he was innocent of, or they would keep his salon and personal license suspended indefinitely.

27.     The Plaintiff ultimately lost his business, his livelihood, and his home when the Defendants refused to provide him with a prompt post-suspension hearing.

## V. FACTS

28.     On Thursday May 18, 2023 two government employees (KBC inspectors Back and Shope) walked into Tippi Nail Lounge in St. Matthews for an unannounced inspection.

29.     They entered the salon at 11:44 a.m., Eastern Time.

30.     Pursuant to 201 KAR 12:060 the KBC is required to inspect each nail salon in Kentucky twice per year, but Tippi had not been inspected by the KBC since it was opened in 2019.

31.     A Vietnamese man (Plaintiff Quoc Dinh) who has been duly licensed nail technician in Kentucky for 17 years, with zero disciplinary history, owned the salon.

32.     He and his wife Ms. Vo worked in the salon as their only source of income for the previous five years.[1]

33.     At this point in time, the Plaintiff and his wife had agreed to hire an Indiana licensed nail technician for part time work in their salon (in between her drives as an Uber driver) while she transferred her license from Indiana to Kentucky.

34.     When the government workers came in, this unidentified employee simply stood up and walked out the front door.

35.     The government inspectors did not identify her.

---

[1] There are three government issued licenses involved: the husband's personal license, the husband's business license, and the wife's personal license, all of which were issued by the KBC.

36.     A conversation between Back and Mr. Dinh followed as provided herein:

a.      Defendant Back asked Mr. Dinh if she had a license.

b.      Mr. Dinh said no, she's just helping out.

c.      Defendant Back asked again if she had a license.

d.      Mr. Dinh said, again, no but she was just helping out.

e.      Defendant Back said, "she was actively working on someone in that chair."

f.      Mr. Dinh was inaudible but appears to say "no she was just helping out."[2]

37.     After the unidentified person left the salon, the salon inspection continued, and Shope asked to inspect "the monomer."

---

[2] It would be an administrative violation if the salon were to hire someone without a Kentucky license if she were engaged in "licensed activity." However, it is unclear from the evidence below who the woman even is, let alone the status of her license, or what she was actually doing when the inspectors walked in. The KBC never identified her. The Petitioner stated she is a licensed nail technician in Indiana transferring her credentials to Kentucky. It is unclear from the record below whether she was in fact engaged in licensed activity at the time of the inspection. Defendant Back swore under oath that he told Tanya Shrout on the day of the inspection that she was engaged in licensed activity. However, during the administrative hearing, he also swore under oath that he actually was not sure if she was engaged in licensed activity or not. The salon owner denies any violation of law, and instead claims she was prepping a client for a pedicure as she waited for a licensed nail technician, but that she did not actually perform a pedicure. (Exhibit A). The video surveillance is consistent with the salon owner's story, because it does show her put on a latex glove and sit down at a pedicure chair, with a client seated in it. However, the surveillance video does not show her engaging in a pedicure. Tracy Shope has sworn under oath that she did see the unlicensed worker providing a pedicure, but no further proof besides her testimony was provided, and the KBC did not have her expound on her testimony of what she meant by "giving a pedicure." In other words, Mrs. Shope did not rule out the Petitioner's claim that she was prepping the client with a foot soak as they waited for a licensed tech to become available. The KBC found this woman to be in violation of the law, which serves as a basis for this petition for judicial review.

38.     Mr. Dinh was sitting down at a workstation, performing a manicure on a client, and, when asked, he said the monomer was next to his right leg.

39.     Shope then walked behind Mr. Dinh, and entered into an "employee only" area, and reached down next to his leg to grab the monomer.

40.     Unbeknownst to Shope or Mr. Dinh, the salon owner's dog was laying underneath the table next to the inspector's leg.

41.     Thus, when Shope reached down toward Mr. Dinh's leg, the dog nipped at her her in self-defense, breaking the skin on her hand.  (Exhibit B).

42.     The dog was laying down under, or near the cash register.  This is an employee only area, but at or near 11:53 a.m. – about 8 minutes after the inspectors entered the salon, Back called the police to report the dogs.  The police then called animal control.

43.     Back claimed on the 911 call that Shope was fine but he had to call EMS per state policy.

44.     The dog was removed from the premises, quarantined for over a month, and the inspector received medical attention for the bite.

45.     Criminal charges were eventually brought against the salon owner for the dog bite, which were ultimately dismissed with prejudice.  (Exhibit C).

46.     Again, in the Plaintiff's 17-year career as a licensed nail technician, he has had zero disciplinary history with the KBC.

47.     Additionally, there was no prior history with the dog, or the nail salon itself, whatsoever.

48.     In fact, prior to the dog bite, Shope is seen on video surveillance playfully talking with the salon owner's other dog, thus everyone (the inspectors, and the customers) knew that the salon had dogs, and no objection was made.

49.     As of May 18, 2023, Tippi Nail Lounge had been in business for five years, the dogs came to work with the owners every day, and the salon currently has 503 Google reviews, which rank the salon as a 4.8 out of 5 stars. (Exhibit D).

50.     Pursuant to 201 KAR 12:060 the KBC is required to inspect each nail salon twice per year, but May 18, 2023, but, again, Tippi had not been inspected by the KBC since 2019.

51.     There were no prior complaints with the dogs in any manner whatsoever, and their presence did not create a risk to the public.

52.     Nonetheless, the Plaintiffs put the dogs away when they were ordered to do so.

53.     Even though the dog had no prior instances of bad behavior, and despite the fact that they were put away in the back of the salon, Back called Shrout and told her there was a dangerous dog in the salon.

54.     In other words, Back knowingly lied about the situation, because he knew that the dogs had been put away, and that they therefore posed no realistic threat to the public.

55.     Back also heard Mr. Dinh tell him that they had never had any problems with the dogs before.

56.     Despite this, Back insisted in his report to Shrout that the Plaintiffs were operating a dangerous salon.

11

57.     To be sure, the inspectors were inside the salon for approximately 8 minutes, total.  Then they both went outside, and Back came back in 14 minutes later and closed the salon permanently.

58.     Thus, within 22 minutes of their arrival, Tippi Nail Lounge was permanently closed, and Mr. Dinh was then effectively denied the opportunity to have any meaningful appeal.

59.     Back claimed that he spoke with Shrout on the phone that day when he stepped out of the salon, but Campbell swore under oath it that she was the one who ordered the salon to be closed.[3]

60.     Campbell claims that it was Back's testimony "verified by the other inspector" that led her to believe that there was an unlicensed worker on the premises, and that the salon was engaged in unlicensed services of providing eyelash extensions and hot wax, and that there was a potentially dangerous animal on site.

61.     Upon information and belief, none of this happened.

62.     None of Back's claims were verified with any physical evidence.

63.     Campbell did not talk to "the other inspector" to verify the claims.

64.     Shrout ordered the salon closed.  She broke the law. And then Campbell and Hunt covered it up.

65.     As a result, the business that the Petitioner spent 17 years building was brought to a screeching, and permanent, halt.

---

[3] The Plaintiff's request an opportunity to conduct discovery to determine if this version of the story is true. *See Elmer C. Maggard, PhD v. Kentucky Board of Examiners of Psychology,* 282 S.W.3d 301 (2008).  Upon information and belief, Shrout ordered the salon closed, and Campbell claimed that she was the one who actually made the order out of damage control.

66.     As previously mentioned, Campbell testified under oath that she ordered the salon to be closed based upon allegations that there was an unlicensed worker in the salon, that the salon was performing unlicensed services, and that there was a dangerous dog inside the salon.

67.     This hardly makes sense, though, because Back (who allegedly told her all of these things) has sworn under oath during the administrative hearing that he was unsure if the salon was engaged in unlicensed services, and by the time the salon was closed, the dogs (who had never bitten anyone else, ever) were already put away. See Administrative Hearing Transcript page 102, ¶'s 24-25, & page 103 in its entirety, and page 104 ¶'s 1-20.

68.     The Plaintiffs are also in possession of evidence that Campbell did not confer with Shope prior to ordering the salon to be closed.

69.     To be sure, the allegation is, Back got mad that a.) Plaintiff's dog snapped at Shope, and b.) that Plaintiff challenged his authority in public; he then called the police "per state policy;" he then called Shrout who has no jurisdiction over inspections whatsoever; Shrout ordered the salon to be closed; Hunt and Back engaged in fraud to cover up the unlawful order; and Campbell perjured herself in order to cover it all up.

70.     Back has a history of professional disciplinary complaints against him, in this particular instance, he displayed aggression and a lack of self control. (Exhibit F).

71.     This was evident in his actions during the incident, which occurred in a relatively tense situation.

72.     During the administrative hearing Campbell acknowledge the possibility that information relayed to her through a phone call may not be reliable, and facts could

be misconstrued through translation.  She also acknowledged that if she were to rely on bad information, then it could potentially lead her a bad decision.

73.     But Campbell is not the one who actually gave the order.  Shrout did.

74.     In other words, Shrout ordered the salon closed, and Campbell swore under oath that she was the one who did it. (Exhibit G).

75.     Nowhere in the law does any individual have that unilateral authority to close a salon.  However, Shrout ordered the salon closed, and then Hunt and Campbell covered for her. (Exhibit H).

76.      Back then placed notice on the salon door of an "indefinite closure" of the salon, with language indicating that the closure could not be challenged. (Exhibit G).

77.     The paper that Back placed on the door did not communicate an opportunity to appeal, or respond, but instead literally ordered the Petitioner to avoid making any other "public announcements."

78.     Despite this order, the Petitioner posted a handwritten note of his own next to the emergency closure post saying he felt as if closure was excessive and perhaps linked to his nationality or race. (Exhibit I)

79.     The Petitioner shared his handwritten note on his business Facebook page, and it was "shared" eleven times.

80.     This means that the KBC's notice of closure, and the Petitioner's handwritten note probably reached thousands of Facebook users within a few hours.

81.     The next day, the KBC sent someone back to the salon with a piece of construction paper in order to cover up the Petitioner's hand written note.

82.     The KBC came back, again, later on to take the construction paper down.

83.     Then on May 24, 2023 Hunt created an "an "Emergency Order" that claimed that "the board" had met and heard evidence related to Tippi Nail lounge, in order to justify Shrout's unlawful closure, when in fact the board did not meet at all. (Exhibit E).

84.     The allegation that Hunt "created" this document out of thin air, attributed its substance to the board, and then had Campbell sign off on it, is based upon the results of an Open Records Requests for all KBC board meeting minutes from October 2022 to November 2023.

85.     Documents responsive to this request do not show any board meetings or minutes in between May 2, 2023 and June 6, 2023. (Exhibit J).

86.     The fact that there are no meeting minutes from the KBC between May 2, 2023 and June 6, 2023 suggests that the board either did not meet during that time, or that they met in secret in violation of the Open Meetings Act.

87.     Upon information and belief, the May 24 "Emergency Order" is not a product of the KBC actually meeting, and reviewing evidence related to a threat to public safety, and it was not made to stop, prevent, or avoid immediate danger to the public health, safety, or welfare.

88.     Instead, upon information and belief, the May 24, 2023 "Emergency Order" was created to make Shrout's May 18 emergency appear to be legitimate and compliant.

89.     Viciously, the May 24 "Emergency Order" didn't stop with the salon license, but it also suspended Mr. Dinh's personal license as well.

90.     And it did so indefinitely with zero reasonable basis to suspend the personal license.

91.     In the last two paragraphs of the May 24 "Emergency Order" it does mention an ability to appeal the decision.

92.     And for all intents and purposes, the salon owner spent the next few weeks trying to appeal.

93.     For several weeks the salon owner sent emails, and made phone calls seeking his due process right to challenge or appeal these findings. (Exhibit K).

94.     However, no emergency appeal was provided.

95.     For example, on May 26, 2023 the Petitioner sent an email to Shrout, , and to the KBC general mailbox, which is believed to have been delivered to Hunt, denying many of the allegations made against him in the "Emergency Order," taking corrective action, and begging for an opportunity to reopen and resume business.

96.     No one from the KBC responded to him, or provided him any additional information on how to actually appeal.

97.     On May 30, 2023 the Petitioner sent an email to KBC's general mailbox, again, denying many of the allegations made against him in the "Emergency Order," and again sought relief and an opportunity to reopen his salon.

98.     Again, no one from the KBC responded to him, or provided him any additional information on how to actually appeal.

99.     On June 1, 2023 the Petitioner sent another email to Shrout, and an email to Maxine McDonald with the KBC, again denying many of the allegations made against

him in the "Emergency Order," and again sought relief and an opportunity to reopen his salon.

100.    Again, no one from the KBC responded to him notifying him of his right to appeal, or explaining how to actually do so.

101.    On June 12, 2023 the salon owner again sought relief from the emergency order, when he emailed the KBC directly to ask what he needed to do to reopen his salon.

102.    Again, no one from the KBC responded to him or provided him any additional information on how to actually appeal.

103.    Then, on June 14, 2023, after weeks of being ignored, the Petitioner drove to the KBC office in Frankfort only to find the office closed to the public.

104.    Mr. Dinh rang the doorbell at the KBC and asked to speak with the director.

105.    The KBC threatened to call the police on Mr. Dinh simply because he sought due process.

106.    Mr. Dinh then called the police himself out of desperation.

107.    Again, no one from the KBC responded to him or provided him any additional information on how to actually appeal.

108.    A few hours after Mr. Dinh was asked to leave the KBC, Hunt sent him a proposed Agreed Order that asked him to admit to 14 administrative violations, many of which had any legitimate basis in law or fact whatsoever, multiple criminal violations that he did not commit, an order to remove his dogs from the salon forever, suspend his salon license for a period of 30 days, go on probation for 2 years, and pay a fine that was,

by some accounts, twenty times the statutory minimum for the violations alleged, or else he would be forced to surrender *both* of his personal and business license, forever.

109.     Keep in mind, the proposed agreed order issued by the KBC specifically told the Petitioner that he would need to admit to crimes that could put him in jail, without advising him of his right against self incrimination, or he would need to keep his salon closed, and his personal license suspended, forever.

110.     The demand that the Plaintiff admit to crimes that he did not commit, without advising him of his right against self incrimination, came after the fact that the same actors involved in this case (Campbell, Back, and Hunt) had four women in Eastern Kentucky charged with multiple felonies for crimes that they did not commit two years prior. (Exhibit L).

111.     Along with the proposed Agreed Order, the KBC also sent correspondence to Mr. Dinh that was apparently designed to advise him of his rights, yet was vague and confusing on how to actually appeal.

112.     The letter starts by saying that "the board" found violations identified in the proposed Agreed Order, though it is unclear what role "the board" actually played in "finding those violations," what evidence they reviewed, and what they did to arrive at their excessive recommended punishments.  On thing is for sure, "the board" never heard from the Plaintiff when they "reviewed the evidence" or recommended a sentence.

113.     Instead, the June 14 proposed Agreed Order was another document drafted by Hunt, signed by Campbell, and attributed to the board.

114.     By the time the Plaintiff received the proposed agreed order on June 14, 2023, he had been out of work for a month, and was unable to pay the fine.

115.    Unable to pay the fine, he asked the KBC via email if there was another way to reopen his salon, and he was told there was no other way. (Exhibit M). (Because, at this point in time, he wrongly still believed the Defendants were operating in good faith).

116.    Shrout simply replied "read the law."

117.    In Mr. Dinh's mind, he only had two options: pay a fine he couldn't afford, or close his salon.

118.    And because he physically could not afford the fine, he really only had one option: close his salon.

119.    Because Mr. Dinh was operating from a belief that he had no other choice, he wrote to the KBC on June 21, 2023 and told them that he had no way to pay the "ransom," and therefore declared in protest the permanent closure of his salon.[4] (Exhibit N).

120.    Hunt almost immediately wrote back accepting Mr. Dinh's "voluntary surrender."

121.    Keep in mind, Hunt had completely ignored Mr. Dinh for weeks.  Yet as soon as Mr. Dinh sent an email showing any sign of surrender, Hunt eagerly jumped at the chance to claim Mr. Dinh had voluntarily surrendered his license.

122.     Shortly thereafter, the salon owner consulted with undersigned counsel who advised him of his right to appeal.

123.    The salon owner hired that attorney and together they filed a timely appeal.  (Exhibit O).

---

[4] The KBC claims this to be a "voluntary surrender" of Tippi's salon license.

124.     When the appeal was initiated Hunt claimed that the salon owner had "voluntarily surrendered" his salon license, communicating that Mr. Dinh had lost his right to an appeal. (Exhibit P).

125.     The salon owner, by counsel, refuted the "voluntary" nature of his surrender, and insisted that he wished to appeal any adverse action against his personal license as well as the license pertaining to his salon. (Exhibit Q).

126.     The Office of the Attorney General then took jurisdiction of the appeal which encompassed adverse action initiated against both the salon owner's personal license, as well as the salon license itself.

127.     Mr. Dinh, by counsel, made numerous attempts for the KBC to lift the suspension of his license pending appeal, because none of the allegations against him had been proven, yet the KBC maintained their false claim of an ongoing emergency threat to the public (Exhibit R).

128.     The salon owner, by counsel, insisted that if the KBC maintained a claim of a public threat then the KBC was required to give him a hearing with 10 days of the request, but an emergency appeal pursuant to KRS 13B.125 was never provided.[5]

129.     Despite the fact that the salon owner and his wife's sole source of income had been taken away from them without an opportunity to speak, and despite demands for an immediate appeal, and the statutory requirement that they provide one within 10 days of the request, the KBC did not provide the accused with a hearing until October

---

[5] Comments made in an unrecorded pre-hearing conference.

2023, which was over five months of complete loss of income, which cost the salon owner his business completely.[6]

130.    Again, with no other options made available for the accused, he waited to be heard, only for the KBC to request an extension on October 1 over the Plaintiff's objection because it was "not ready to present its case."

131.    The next available date was December 14, 2023.

132.    The petitioner, by counsel, objected to an unjust delay but the KBC received a new hearing date of December 14, 2023.

133.    Again, the accused, by counsel, made additional requests to at least release the salon owner's personal license so he could work at a different salon pending the appeal, yet the KBC refused. (Exhibit S).

134.    Despite multiple additional requests to allow the Respondents to reopen his salon or regain his license pending the appeal, the KBC refused, and kept the salon closed, and the owner's license frozen during that seven month wait under the guise of a public health emergency.

135.    Thus for seven months the KBC claimed the power that comes with KRS 13B.125 without abiding by the procedural safeguards found therein.

136.    Finally, on December 14, 2023 there was an Administrative Hearing on the charges and recommended punishment against the Respondents at the KBC office in Frankfort, KY.

---

[6] 17 years invested in building this career was gone on May 18, 2023, without a due process hearing. By the time the accused finally got a hearing, he had lost his business, his business lease, his customers, his equipment, his personal license to rebuild with, his housing, and his savings.

137.    During the hearing the KBC called three witnesses to present their case. The KBC elicited testimony from witnesses, and the salon's attorney cross examined them, and offered rebuttal evidence.

138.    On December 31, 2023, the court reporter from the Administrative Hearing released the transcript of the hearing.

139.    On March 14, 2024 the hearing officer sent a recommended order that stated that the agency failed to prove that the salon owner was providing unlicensed services, or that the salon owner had voluntarily surrendered his license.

140.    The hearing officer did recommend a finding that the salon had hired an unlicensed worker, which the Petitioner herein challenges, but the hearing officer greatly reduced the fine to $2,750 instead of $12,750.

141.    The recommended order was silent as to the validity of the emergency closure, the failure to provide an emergency hearing, or the unprecedented 9-month probation pending appeal for a first offense.

142.    Both parties filed exceptions, and on April 12, 2024 the KBC filed a final order stating that the Petitioner's effort to appeal was apparently futile because he "voluntarily surrendered his license" in June of 2023.

## VI. CAUSES OF ACTION

## COUNT ONE – VIOLATION OF DUE PROCESS

### (Against all Defendants individually)

143.    The government cannot take life, liberty, or property away from the Plaintiff without due process, yet in this case, the Defendants did in fact take the Plaintiff's property from him without due process.

144.    Due process in most cases requires notice and an opportunity to be heard prior to a deprivation of life, liberty, or property.

145.    Plaintiff owned a property right in his occupational salon and personal licenses, and the KBC took that property away from him on May 18, 2023.

146.    In this case, there was no pre-suspension hearing, which violated the Plaintiff's due process protected by the Fourteenth Amendment to the United States Constitution.

147.    If this Court disagrees, and instead finds that the government was justified in closing the Plaintiff's salon prior to providing him a hearing, the Defendants still violated the Plaintiff's due process rights by suspending the Plaintiff's personal license as the salon license was adjudicated.

148.    Additionally, even if this Court believes the Defendants were justified in closing the Plaintiff's salon without a hearing, that justification would not extend to her personal license, and due process would still require the government to give the Plaintiff a prompt post-suspension hearing for the salon license, which they failed and or refused to do.

149.    For example, because the Plaintiff's salon was subject to an emergency closure pursuant to KRS 317A.020 (7), the KBC was required – pursuant to KRS 13B.125 – to give the Plaintiff an emergency hearing within 10 days of his request for relief.

150.    The Plaintiff made persistent requests for relief from May 26, 2023 until October 2023, and to this day the KBC had not provided the Plaintiff with a KRS 13B.125 emergency hearing.

151.     Furthermore, if this Court finds that an emergency hearing was not required in this case, due process would still require the KBC to provide the Plaintiff with a prompt post-suspension hearing, which the KBC failed and or refused to do.

152.     Each Defendant was operating under color of state law when they violated the Plaintiff's Federal Constitutional rights.

153.     As a direct and proximate cause of this violation, the Plaintiff has suffered damages in excess of the jurisdictional limits of this Court.

## COUNT TWO – VIOLATION OF THE EQUAL PROTECTION CLAUSE

### (Against all Defendants individually)

154.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandates that no state shall deny to any person within its jurisdiction the equal protection of the laws

155.     This clause is essentially a directive that all persons who are similarly situated should be treated alike, preventing governmental decision-makers from treating differently persons who are in all relevant respects alike.

156.     In this case, the Defendants engaged in a pattern or practice of treating Asian differently than their similarly situated white counterparts.

157.     The Defendants discriminated against the Plaintiff due to his race in violation of the Equal Protection Clause, in this case.

158.     But for the Plaintiff's race, nationality, and or ethnicity, his salon would not have been closed, he would have received due process, his personal license would not have been suspended pending an appeal, Hunt and Campbell would not have leveraged ethics and sanitation violations against him for a self-defense dog nip, Hunt and

Campbell would not have fined him – by many counts – more than 20 times the statutory limits for his first offense, and his salon would still be open to this day.

159.    As a direct and proximate cause of this intentional discrimination, the Plaintiff has suffered damages in excess of the jurisdictional limits of this Court.

**WHEREFORE**, the Plaintiff Quoc Dinh respectfully requests the following:

A.    That this Court grant the Petitioner the ability to conduct appropriate and necessary discovery in order to prove the allegations set forth in this Petition for Judicial Review with respect to the alleged unconstitutional and or tortious misconduct by the named Defendants, or other unnamed Defendants;

B.    A trial by jury on all issues triable;

C.    Compensatory damages;

D.    Equitable relief in the form of a finding by this Court that when the KBC issues an emergency closure of any Kentucky hair or nail salon that they must provide an emergency hearing within 10 days of a requested appeal, pursuant to KRS 13B.125;

E.    Punitive damages in an amount sufficient to punish Defendants for their willful, wanton, oppressive, fraudulent, malicious, and grossly negligent conduct;

F.    All costs expended in this matter including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 , plus pre- and post-judgment interest; and

G.    Any and all other relief to which he may be entitled.

Respectfully submitted,


___/s/ David S. Borum_____
David Borum, Attorney at Law PLLC
*Attorney for Plaintiff*
*KENTUCKY BAR #99498*
517 West Ormsby Avenue
Louisville, KY 40203
dsborum@gmail.com
Cell: (270) 617.1957
Fax: (502) 470.3194

## **VERIFICATION OF COMPLAINT**

I, Quoc Dinh, being duly cautioned and sworn, state that I am the Plaintiff in this action. To the extent that I have personal knowledge of the matters alleged in the complaint, I verify the information is true and accurate to the best of my knowledge and belief.

FURTHER THE AFFIANT SAYETH NAUGHT.

_____
Quoc Dinh

COMMONWEALTH OF KENTUCKY )
COUNTY OF Jefferson                )

Subscribed and sworn to before me by Quoc Dinh on this 17th day of May 2024, to be her free act and voluntary deed.

My commission expires October 7, 2026

Jennifer LaGrange
NOTARY PUBLIC   KYNP 59087

27

## VERIFICATION OF COMPLAINT

I, Quoc Dinh, being duly cautioned and sworn, state that I am the Plaintiff in this action. To the extent that I have personal knowledge of the matters alleged in the complaint, I verify the information is true and accurate to the best of my knowledge and belief.

FURTHER THE AFFIANT SAYETH NAUGHT.

_____
Quoc Dinh

COMMONWEALTH OF KENTUCKY )
COUNTY OF Jefferson            )

Subscribed and sworn to before me by Quoc Dinh on this 17th day of May 2024, to be her free act and voluntary deed.

My commission expires October 7, 2026

NOTARY PUBLIC   KYNP 59087

27